# Exhibit B
# to Affidavit of Henry J. Burbank

SUBARU

## Standard Provisions

## 1 Introduction

**1.1 Standard Provisions.** The following Standard Provisions are a part of, and are incorporated by reference into, the Subaru Dealer Agreement between Dealer and Distributor (hereinafter the "Agreement") and shall apply to and govern the transactions, dealings, and relations between Distributor and Dealer, as those parties are identified in the Agreement. The Agreement and these Standard Provisions were developed for use by all Subaru dealers to ensure a degree of nationwide uniformity in Subaru operations. In the effort to achieve such uniformity, consideration was given to accommodating the laws of the various states and other jurisdictions in which Subaru dealers operate. To the extent that either the Agreement or the Standard Provisions are contrary to applicable law, such law shall govern the contractual relationship between Distributor and Dealer. Distributor may offer amendments to the Agreement and the Standard Provisions to all of Distributor's affected dealers, as necessary, to suit local conditions or to conform with applicable law.

## 2 Definitions

As used in the Agreement and herein, the following terms shall be defined as indicated below:

**2.1 Dealer.** The term "Dealer" means that business entity identified in Paragraph 1 of the Agreement.

**2.2 Distributor.** The term "Distributor" means that party identified in Paragraph 1 of the Agreement, which shall be either SOA or one of its Independent Distributors, as the case may be. Distributor has the sole responsibility of performing its obligations under the Agreement in a lawful and ethical manner and has the exclusive authority to appoint Dealer (except as set forth in Paragraph 13 of the Agreement), to administer the Agreement (except as set forth in Sections 6.4, 7.6, and 16.3, and Subsection 18.1.1 hereof), and to renew or terminate the Agreement.

**2.3 SOA.** The term "SOA" means Subaru of America, Inc., a New Jersey corporation, which, along with its subsidiaries, possesses the exclusive right to sell Subaru Products in the United States, and which has authorized Distributor to sell Subaru Products to dealers selected by Distributor. It is acknowledged by the parties to the Agreement that SOA shall have no responsibility for the administration, termination, expiration, or performance (except as set forth in Section 19.2 hereof) of the Agreement.

**2.4 Fuji.** The term "Fuji" means Fuji Heavy Industries Ltd., a Japanese corporation which designs and manufactures Vehicles and sells them to SOA.

**2.5 Area of Responsibility.** The term "Area of Responsibility" means that area which is designated in Paragraph 5 of the Agreement, and for which Dealer assumes responsibility for the promotion, sale and service of Subaru Products. The Area of Responsibility is not necessarily exclusive to Dealer and one or more other authorized Subaru dealers may share the same Area of Responsibility because of its size and market potential. If other Subaru dealers do share the same Area of Responsibility, Dealer's responsibility for the Area of Responsibility shall be determined from time to time on a proportionate basis by Distributor after reviewing in consultation with Dealer relevant statistics and available information concerning population size, demographics, consumer shopping habits, traffic patterns, and other geographical factors applicable to the Area of Responsibility.

2.6 **Minimum Standards.** The term "Minimum Standards" means:

2.6.1 Those national standards applicable to Subaru dealers nationwide, as set forth in the most current version of the Subaru Dealer National Minimum Standards and Operating Guidelines Worksheet, as amended from time to time ("Subaru Dealer National Minimum Standards"). These standards require commitments of resources, personnel, facilities, and other undertakings by Dealer commensurate with Dealer's Minimum Standards Level; and

2.6.2 Those standards applicable to Subaru dealers appointed by Distributor, as set forth in the Distributor Minimum Standards, if any, adopted and published by Distributor pursuant to Section 5.2 hereof, as amended from time to time ("Distributor Minimum Standards"). Distributor Minimum Standards are of general application to all Subaru dealers appointed by Distributor and are designed to augment the Subaru Dealer National Minimum Standards in order to meet regional conditions or methods of operation.

The Minimum Standards represent minimum requirements which Dealer is encouraged to exceed voluntarily in order to improve its operations as needed and to prepare for possible future growth of Dealer and its service of Subaru customers.

2.7 **Operating Guidelines.** The term "Operating Guidelines" means:

2.7.1 Those national guidelines applicable to Subaru dealers nationwide, as set forth in the most current version of the Subaru Dealer National Minimum Standards and Operating Guidelines Worksheet, as amended from time to time ("Subaru Dealer National Operating Guidelines"). These guidelines provide for commitments of resources, personnel, facilities and other undertakings by Dealer commensurate with Dealer's Minimum Standards Level; and

2.7.2 Those guidelines applicable to Subaru dealers appointed by Distributor, as set forth in the Distributor Operating Guidelines, if any, adopted and published by Distributor pursuant to Section 5.2 hereof, as amended from time to time ("Distributor Operating Guidelines"). Distributor Operating Guidelines are of general application to all Subaru dealers appointed by Distributor and are designed to augment the Subaru Dealer National Operating Guidelines in order to meet regional conditions or methods of operation.

The Operating Guidelines represent obligations which Dealer is encouraged to exceed voluntarily in order to improve its operations as needed and to prepare for possible future growth of Dealer and its service of Subaru customers.

2.8 **Minimum Standards Level.** The term "Minimum Standards Level" means either the Planning Volume, or the Units in Operation, or the Units In Operation plus the Planning Volume, or the Units In Operation plus a multiple of the Planning Volume, whichever is the appropriate measure for determining compliance by Dealer with Minimum Standards and with Operating Guidelines.

2.9 **Planning Volume.** The term "Planning Volume" means the proportionate number of Vehicles which, if sold by Dealer within the Area of Responsibility in a twelve-month period, would equal a market penetration level selected by Distributor as appropriate for the Area of Responsibility. Planning Volume is not intended as a measure of Dealer's sales performance but rather is a significant factor in determining Dealer's Minimum Standards Level.

2.10 **Units In Operation.** The term "Units in Operation" means the number of Vehicles, as defined by SOA, in operation in the Area of Responsibility at the time the Agreement is executed. Units In Operation is not intended as a measure of Dealer's sales performance but rather is a significant factor in determining Dealer's Minimum Standards Level.

2.11 **Facilities.** The term "Facilities" means those Subaru-approved building(s) and property(ies), both individually and collectively, as described in Paragraph 11 of the Agreement, in which and on which Dealer conducts its Subaru operations.

2.12 **Vehicles.** The term "Vehicles" means Subaru brand vehicles which are manufactured by or for Fuji and sold by SOA.

2.13 **Genuine Subaru Parts.** The term "Genuine Subaru Parts" means parts, accessories, and optional equipment manufactured by or for Fuji or SOA and distributed only through SOA.

2.14 **Subaru Products.** The term "Subaru Products" means, but is not limited to, Vehicles and Genuine Subaru Parts.

2.15 **Warranty.** The term "Warranty" means the written consumer product warranties, individually and collectively, covering the Subaru Products specified in each such warranty, that SOA may issue from time to time. The term shall not refer to any warranty or warranties provided by any other entity.

2.16 **Marks.** The term "Marks" means any trademark, service mark, collective mark, certification mark, logo, insignia, product designation, slogan, fictitious name, or trade name, now or at any time hereafter adopted, used, or claimed by Fuji, SOA or Distributor, and any word(s), coined word(s), symbol(s), device(s), or abbreviation(s), or any combination thereof which is similar to, which is likely to be confused with, or which contains a significant part or element of, any such trademark, service mark, collective mark, certification mark, logo, insignia, product designation, slogan, fictitious name, or trade name.

2.17 **Distributor Directive.** The term "Distributor Directive" means any directive issued by Distributor under and subject to Section 5.2 hereof.

2.18 **New Dealer Candidate.** The term "New Dealer Candidate" means, either individually or collectively, the individual applicant(s) for the Agreement and the entity formed or to be formed by such applicant(s) for purposes of operating under the Agreement.

2.19 **Controlling Owner.** The term "Controlling Owner" means any entity having any controlling interest in Dealer, either through actual ownership or otherwise. Dealer agrees that all Controlling Owners are indicated in Paragraph 7 of the Agreement.

2.20 **Majority Controlling Owner.** The term "Majority Controlling Owner" means that one entity or individual having the majority controlling interest in Dealer, either through actual ownership or otherwise, and listed as the first Controlling Owner in Paragraph 7 of the Agreement.

2.21 **Investing Owner**. The term "Investing Owner" means any person with an investment interest in Dealer, whether or not that investment interest confers upon the Investing Owner any controlling interest. Dealer agrees that all Investing Owners are indicated in Paragraph 9 of the Agreement.

2.22 **Dealer Management.** The term "Dealer Management" means those individuals who may transact business with Distributor on behalf of Dealer, and in so doing shall legally bind Dealer, unless otherwise indicated in Paragraph 10 of the Agreement. Dealer agrees that all members of Dealer's Dealer Management are indicated in Paragraph 10 of the Agreement.

**2.23 Executive Manager.** The term "Executive Manager" means that one individual who is authorized to conduct business with Distributor in any capacity on behalf of Dealer, and who has full signing authority on behalf of Dealer, and who is named as Executive Manager in Paragraph 10 of the Agreement.

**2.24 General Manager.** The term "General Manager" means that individual who, as a full-time employee of Dealer at Dealer's principal place of business indicated in Paragraph 1 of the Agreement, is responsible for the overall day-to-day operation of Dealer and who is named in Paragraph 10 of the Agreement.

**2.25 Department Manager.** The term "Department Manager" means any Dealer Manager who is employed at Facilities and is active in Subaru management at a level below the General Manager, such as but not limited to, a general sales manager, a new vehicle sales manager, a used vehicle sales manager, a parts and service director, a service manager, or a parts manager.

**2.26 Change of Controlling Ownership Interest.** The term "Change of Controlling Ownership Interest" means:

(a) Any change of existing Controlling Ownership interests in Dealer which creates a new Majority Controlling Owner; or

(b) The admission of a new Controlling Owner of Dealer; or

(c) Any other transfer by Dealer of any rights or obligations under the Agreement.

## 3 Reservation of Rights

**3.1 Non-Exclusive Sales Territory.** Dealer acknowledges that SOA has reserved the right to sell or lease Subaru Products directly, anywhere within the United States to the following: the United States Government or any subdivision, department, or agency thereof; the American Red Cross; national or chain store organizations; any company which rents or leases cars; fleet purchasers; employees of SOA or of its subsidiaries and the immediate family members of such employees; any company with whom SOA enters into a barter transaction for any reason, including any exchange of merchandise whatever; any person or entity for promotional or advertising purposes; any person or entity desiring to purchase used company cars utilized by SOA or by its subsidiaries.

## 4 Customer Satisfaction

**4.1 Subaru Image and Customer Satisfaction.** Distributor and Dealer acknowledge the importance of satisfying their customers and the necessity of promoting the image and reputation of Subaru Products in the marketplace. Distributor and Dealer further acknowledge that in the marketing, sales, and servicing of Subaru Products, it shall be the goal of Distributor and Dealer to achieve the highest level of customer satisfaction possible.

**4.2 Customer Satisfaction Responsibilities of Dealer.** Dealer acknowledges that Dealer is the primary contact with the customer, and, therefore, Dealer shall have the principal responsibility of advancing the goals of customer satisfaction. Accordingly, Dealer agrees to keep Distributor informed about customer complaints and concerns. Furthermore, Dealer agrees to use its best efforts to resolve customer satisfaction issues in a fair and honest manner, keeping as the primary objective the courteous and expeditious treatment of the customer.

## 5 Basic Obligations

**5.1 Ethical Standards.** Dealer agrees:

(a) to safeguard and promote the reputations of Subaru Products, of Fuji, of SOA, of Distributor, and of all Subaru distributors and dealers; and

(b) to refrain from all conduct which might be harmful to such reputations or to the marketing of Subaru Products, or which might be inconsistent with the public interest; and

(c) not to misrepresent the items making up the total selling price of any Subaru Products or the amount of any charges to its customers; and

(d) not to engage in any unfair, deceptive, misleading, unethical, discriminatory, fraudulent, illegal, or otherwise prohibited practice.

**5.2 Compliance With Distributor Directives.** Dealer agrees to comply promptly with all reasonable and lawful written Distributor Directives which are of general application to all dealers appointed by Distributor. Dealer shall be presumed to have acknowledged the reasonableness of any given Distributor Directive, unless Dealer promptly notifies Distributor in writing to the contrary at the time when compliance is first required under the terms of the Distributor Directive, and produces substantial evidence that compliance with the Distributor Directive would be unreasonable or unnecessary due to Dealer's particular circumstances. Upon receipt of such notice, Distributor shall evaluate any evidence produced by Dealer and notify Dealer in writing whether compliance by Dealer with such Distributor Directive may be delayed or excused, in whole or in part, due to Dealer's particular circumstances.

**5.3 Compliance With Minimum Standards.** Dealer acknowledges the importance of the Minimum Standards and agrees that compliance by Dealer with the Minimum Standards is an essential element of Dealer's performance under the Agreement and is required at all times. Dealer shall be presumed to have acknowledged the reasonableness of all applicable Minimum Standards, unless Dealer promptly notifies Distributor in writing to the contrary at the time when compliance is first required in connection with Dealer's Minimum Standards Level, and produces substantial evidence that compliance with one or more of the applicable Minimum Standards would be unreasonable or unnecessary due to Dealer's particular circumstances. Upon receipt of such notice, Distributor shall evaluate any evidence produced by Dealer and notify Dealer in writing whether compliance by Dealer with any one or more of the applicable Minimum Standards may be delayed or excused, in whole or in part, due to Dealer's particular circumstances, provided that Distributor shall not excuse or permit delay in compliance with the Minimum Standards by a New Dealer Candidate or upon a Change of Controlling Ownership Interest, unless Distributor is required to do so by applicable law.

## 6 Facilities

**6.1 Size and Layout.** Unless otherwise stated in an addendum to the Agreement, Dealer represents that the Facilities are, at the time of execution of the Agreement, of sufficient size and of satisfactory layout and design to comply with Dealer's Minimum Standards Level and will remain in compliance throughout the term of the Agreement. Dealer agrees to continuously maintain the Facilities in a manner satisfactory to Distributor in appearance and condition.

6.2 **Planning Assistance.** Representatives of Distributor will be available to Dealer from time to time to counsel and advise Dealer in connection with the planning and equipping of the Facilities.

6.3 **Other Subaru Locations.** Distributor and Dealer recognize that Dealer is free to sell Subaru Products to retail customers wherever those customers may be located. However, in order that Distributor may establish and maintain an effective network of Subaru dealers, Dealer agrees not to change the location of any of its Subaru operations or to establish any additional facilities other than its approved Facilities for use in its Subaru business without obtaining the prior written consent of Distributor. Dealer agrees to submit to Distributor all information and documentation requested by Distributor in order to allow Distributor to adequately analyze Dealer's request for such change in location or the establishment of additional facilities.

6.4 **Display of Subaru Signs.** Dealer agrees to lease, from SOA, signs which meet design, size, and content specifications established by SOA, and which bear the name "Subaru" and other Marks, as appropriate, and to display said signs in such numbers and at such locations as will adequately identify Dealer's Facilities and products and services to the general public. Dealer agrees to keep said signs in good maintenance and repair. Dealer further agrees to procure any requisite zoning variances in order to install required signage. In the event that Dealer relocates to a different approved location, Dealer shall immediately remove from the Facilities all such signs not owned by SOA and arrange for authorized sign placement at the new location.

6.5 **Addition of Other Vehicle Lines.** Dealer acknowledges that its adding and maintaining another line of vehicles or another automobile dealership operating simultaneously at the Facilities could adversely affect Dealer's performance regarding sales, service, and customer experience performance with respect to Subaru Products. Except where exclusivity is a stipulation of a covenant of the Agreement, Dealer agrees to notify Distributor in writing and to obtain Distributor's written approval prior to applying for an agreement or letter of intent to add a new line of vehicles to be sold or serviced at the Facilities or to operating another automobile dealership at the Facilities.

## 7 Operations

7.1 **Personnel.** Dealer shall employ qualified and trained sales, service, and parts personnel at least in such capacities and in such numbers as are specified in the applicable Minimum Standards and Operating Guidelines.

7.2 **Training.** Dealer agrees to require such personnel to be trained in such training courses as may be offered or designated from time to time by Distributor.

7.3 **Business Hours.** Dealer shall operate the Facilities during, and for not less than, the customary business hours for automobile dealer sales and service facilities in the Area of Responsibility.

7.4 **Business Forms.** In connection with its Subaru operations, Dealer shall exclusively use business forms in the format as Distributor may specify from time to time.

7.5 **Dealer Communications System.** Distributor has developed a dealer communications system to facilitate, among other things, accurate and prompt reporting of Dealer's operational and financial data and entering of parts orders and warranty claims. Dealer agrees to utilize the dealer communications system in accordance with policies and procedures as established by Distributor and amended from time to time. Dealer

acknowledges the importance of expedient and effective communication between Distributor and Dealer and agrees to acquire and maintain hardware and software as specified by Distributor for this purpose. Dealer shall implement, within reasonable time frames as specified by Distributor, necessary changes, additions, or modifications to its hardware and/or software as may be required by Distributor from time to time.

7.6 **Use of Marks.** In order to ensure common identity of Subaru Products and services to the public, Dealer shall not use or permit the use of the name "Subaru" or any other Marks except for such purposes incident to the promotion, sale, and service of Subaru Products pursuant to the Agreement as Distributor may be authorized to specify in writing from time to time. Dealer shall not use the name "Subaru" or any other Marks as part of its legal, trade, or business name without obtaining the prior written consent of Distributor. Notwithstanding Distributor's authorization of, or consent to, any use by Dealer of the Marks either in the promotion, sale, or service of Subaru Products or as part of Dealer's corporate, trade, or business name, Dealer shall comply immediately with any written notice from Fuji, SOA, or Distributor requesting or demanding that Dealer cease any or all use of the Marks. Any use of the Marks by Dealer and all accompanying goodwill will inure exclusively to the benefit of Fuji, SOA, or Distributor, whichever is the owner of the respective Mark or Marks used by Dealer. Dealer shall allow representatives of Fuji, SOA, and Distributor, or any of them, on Dealer's premises at any time to inspect Dealer's premises, merchandising methods, and inventory in order to protect the goodwill associated with the Marks and to protect against misuse of the Marks in contravention of the Agreement.

## 8 Independent Status

8.1 **Dealer Not An Agent.** Dealer shall transact all business pursuant to the Agreement on its own behalf and for its own account. Accordingly, Dealer has no power or authority whatever to act as an agent, legal representative or otherwise for the account of or on behalf of Fuji, SOA or Distributor. Dealer is not granted any express or implied right or authority to assume or create obligations for, or to act in any manner as agent for, Fuji, SOA, or Distributor. However, Dealer shall comply fully with its obligations pursuant to Sections 14.2, 14.3, and 15.2 hereof. Neither Distributor nor Dealer shall bear any fiduciary duty to the other by reason of execution of the Agreement.

8.2 **Disclaimer of Liability.** Neither Fuji, SOA, nor Distributor shall be responsible or liable for any act or failure to act by Dealer in connection with Dealer's performance under or in connection with the Agreement.

## 9 Sales Promotion and Marketing

9.1 **Promotional Activities.** Dealer shall use its best efforts to aggressively, actively, and effectively promote the sale of Subaru Products in the Area of Responsibility through regular contacts with existing and prospective owners and users of Subaru Products, including participation in promotional events in accordance with reasonable Distributor Directives.

9.2 **Advertising.** In order to inform and remind the general public of the desirability of Subaru Products, Dealer shall advertise Subaru Products through advertising media selected by Dealer or through any cooperative advertising group in which Dealer may choose to participate. For each Vehicle purchased, Dealer shall expend for direct advertising, for cooperative media advertising, or for both, an aggregate sum as may be specified from time to time by any applicable Distributor Directive. Additionally, Dealer shall maintain listings in

local classified telephone directories in the Area of Responsibility identifying Dealer as a dealer in Subaru Products. Dealer acknowledges the need for maintaining the highest standard of ethical advertising which is of quality and dignity consistent with the national and regional advertising campaigns for Subaru Products. Dealer agrees that it will not advertise, promote, or trade Subaru Products in such a manner as to injure or be detrimental to the goodwill and reputation of Fuji, SOA, Distributor, all Subaru distributors and dealers, and the Marks. It is Dealer's responsibility to ensure that all of Dealer's advertising shall fully comply with all applicable federal, state and local laws, ordinances, rules, and regulations.

## 10 Sales Performance

10.1 **Establishment of Planning Volume.** The execution of the Agreement establishes Dealer's Planning Volume, which is set forth in Paragraph 6 of the Agreement. Distributor, in consultation with Dealer, will have calculated the Planning Volume in accordance with the formula described in the current Subaru Market Development Procedures Manual, or such other reasonable criteria as SOA may from time to time utilize.

10.2 **Sales Performance.** Dealer agrees to effectively sell Subaru Products to customers located in the Area of Responsibility. Dealer's performance of its sales obligations, without regard to its Planning Volume, will be evaluated by Distributor on the basis of such reasonable criteria as Distributor may develop from time to time, including, but not limited to, those reasonable sales objectives that Distributor may establish and a comparison of Dealer's sales performance with other Subaru dealers.

## 11 Sales Practices

11.1 **Defect and Damage.** In the event that any Subaru Product shall become defective or damaged subsequent to its release by Distributor to Dealer, to Dealer's agent, or to a freight carrier, Dealer shall repair such defect or damage so that the Subaru Product shall be in first class salable condition, in accordance with any applicable law, prior to use by Dealer or delivery to a customer. Dealer agrees to provide customer with any and all disclosure as prescribed by applicable law. In the event of extensive defect or damage which would make it unfair, unsafe, or unlawful to sell the Subaru Product to a customer or to sell the Subaru Product as new , Dealer and Distributor shall jointly determine the action to be taken by Dealer with respect to such Subaru Product.

11.2 **Modifications to Subaru Products.** Distributor may from time to time require Dealer to make modifications specified by SOA to certain Subaru Products and to refrain from making other modifications to any Subaru Products. Dealer shall be reimbursed by Distributor for Genuine Subaru Parts and labor, in accordance with Section 20.5 hereof, for modifications to any Subaru Products required by Distributor pursuant to this Section.

11.3 **Quality of Parts Sold.** Dealer shall not promote, offer to sell, or sell, for any purpose, any parts, accessories, or optional equipment which are not Genuine Subaru Parts or other parts, accessories, or optional equipment expressly approved by SOA, if:

(a) The parts, accessories, or optional equipment can adversely affect the mechanical operation, safety, or performance of any Vehicle or any component thereof; or

(b) The parts, accessories, or optional equipment are not equivalent in quality and design to Genuine Subaru Parts or to other parts, accessories and optional equipment expressly approved by SOA.

However, following receipt of written notice from Distributor, the provisions contained in items (a) and (b) of this Section 11.3 shall be null and void in any jurisdiction in which SOA or Distributor may lawfully restrict Dealer from selling or promoting any parts, accessories or optional equipment which are not Genuine Subaru Parts.

11.4 **Authenticity of Genuine Subaru Parts.** Dealer shall not offer to sell, or sell, for any purpose, any item represented as a Genuine Subaru Part which is not, in fact, a Genuine Subaru Part. Prior to the consummation of each sale, Dealer shall clearly and conspicuously identify to its customer, in writing, each part, accessory or item of optional equipment which is not a Genuine Subaru Part. In the event that Distributor gives written notice and implements the provision in Section 11.3 hereof which prevents Dealer from selling or promoting parts, accessories or optional equipment which are not Genuine Subaru Parts, the preceding sentence shall become null and void.

## 12 Orders And Purchases

12.1 **Purchase Orders.** When submitting purchase orders to Distributor for Subaru Products, Dealer shall only use forms supplied and made available by Distributor or shall transmit the order by such means as may be specified by Distributor from time to time. Such purchase orders shall be for delivery to Dealer during such period or periods as Distributor may from time to time indicate, and all such purchase orders may be accepted by Distributor in whole or in part. Such acceptance shall be valid if made by written notice to Dealer or by actual delivery or release of Subaru Products to Dealer. Every purchase order shall be binding upon Dealer unless and until it is rejected in writing by Distributor.

12.2 **Prices.** Distributor shall sell Subaru Products to Dealer at such prices and upon such terms as may be established from time to time by Distributor. Dealer shall pay any and all sales tax, use tax and other governmental or municipal charges imposed or levied or based upon the sale of Subaru Products by Distributor to Dealer. Dealer shall be responsible for and pay all expenses incurred after the Subaru Products have been released by Distributor to Dealer, to Dealer's agent, or to a freight carrier. Such expenses shall include, but not be limited to, transportation, storage and insurance, as well as the cost of arrangements connected therewith.

12.3 **Price Changes.** In the event of any increase by Distributor in prices established for Subaru Products, and unless otherwise required by applicable law, Dealer:

(a) Shall not have the right to cancel any outstanding purchase orders for Subaru Products which are affected by the price increase, and

(b) Shall be responsible for payment of the price prevailing on the date title to the affected Subaru Products passes to Dealer.

12.4 **Payment.** Dealer must furnish to Distributor, upon demand, documentation that it possesses a committed floor plan line of credit from a financial institution approved by, and in a form acceptable to, Distributor. Such floor plan line of credit must be available exclusively for new Subaru Vehicles and must provide for, and be fully available for, payment of Vehicles upon presentation of a draft for payment. Dealer may, prior to presentment of a draft by Distributor under the floor plan line of credit, elect to make timely payment to Distributor by means of cash or a check if such method of payment is then acceptable to Distributor. At the time Dealer places each purchase order for goods other than Vehicles, Dealer must make payment to Distributor of the full purchase price by means of cash or a certified or bank cashier's check, unless Distributor states from time to time in

writing that other terms of payment will be accepted from Dealer. Dealer warrants that all checks issued to Distributor and all drafts drawn by Distributor under the floor plan line of credit, when submitted by Distributor to the designated financial institution on the appropriate date, shall provide Distributor with good and collected funds. Dealer shall pay all collection charges and costs of exchange, if any, incurred in connection with its payments.

12.5 **Governmental Taxes.** Dealer represents and warrants, with respect to all Subaru Products purchased from Distributor by Dealer for resale in the ordinary course of Dealer's business, that Dealer has complied with all pertinent provisions of state or local law prerequisite to the collection and payment by Dealer of all sales tax, use tax and other governmental or municipal charges applicable to all such resale transactions and that Dealer will furnish evidence thereof to Distributor upon request. In the event that any Subaru Products are put to a taxable use by Dealer or are, in fact, purchased by Dealer for purposes other than resale in the ordinary course of Dealer's business, Dealer shall make timely return and payment to the appropriate taxing authorities of all applicable sales tax, use tax and other governmental or municipal charges imposed or levied or based upon the sale of such Subaru Products by Distributor to Dealer. Dealer agrees to defend, hold harmless, and indemnify Fuji, SOA, and Distributor from and against any and all claims and demands which may be made by any taxing authorities with respect to such tax returns or payment.

12.6 **Passing of Title.** Title to Subaru Products sold shall remain with Distributor, and Distributor shall have the right to retake and resell the Subaru Products sold until Distributor shall have collected actual cash in the full amount of the purchase price therefor.

12.7 **Passing of Risk.** Subaru Products sold shall be at Dealer's risk and peril from the time of their release by Distributor to Dealer, to Dealer's agent, or to a freight carrier. Subsequent to such release of the Subaru Products, it shall be Dealer's responsibility and expense to insure against risks of damage, destruction, and loss for Dealer's own benefit, and, in the event that title has not yet passed, for the benefit of Distributor.

12.8 **Right of Set Off.** In addition to any right of set off provided by law, all sums due Dealer shall be considered net of indebtedness of Dealer to Distributor, and Distributor may deduct any amounts due, or to become due, from Dealer to Distributor or any amounts held by Distributor from any sums or accounts due from Distributor to Dealer.

12.9 **Extent of Distributor's Responsibility for Defect and Damage.** Distributor assumes responsibility for the condition of any Subaru Product, only to the extent of defect and damage which are not commercially acceptable and which are caused by any event occurring prior to release by Distributor of the Subaru Product to Dealer, to Dealer's agent, or to a freight carrier. Dealer shall cause all such defects and damage to be repaired fully and in accordance with any applicable Distributor Directive before the Subaru Product is delivered to a customer. Dealer agrees to provide customer with any and all disclosure as prescribed by applicable law. Dealer shall pay the full purchase price for such Subaru Product in accordance with Section 12.5 hereof prior to repairing any defect or damage. Dealer shall be reimbursed by Distributor for Genuine Subaru Parts and labor in accordance with Section 20.5 hereof upon submission by Dealer of proof of repair.

12.10 **Claims.** All claims for incomplete delivery of Subaru Products must be submitted to Distributor in accordance with the policies detailed in the Subaru Customer/Dealer Services Policies, Guidelines, and Procedures Manual as amended from time to time.

12.11 **Change of Specifications.** Subaru Products will be delivered by Distributor to Dealer in accordance with the specifications applicable at the time of manufacture of the Subaru Products. In the event of any change or modification with respect to the specifications for

any one or more Subaru Products, Dealer shall not be entitled to have such change or modification made with respect to any Subaru Products which shall have been manufactured prior to the introduction of the change or modification thereof.

12.12 **Discontinuance of Manufacture.** The manufacture and production of all or part of any one or more Subaru Products may be discontinued or curtailed at any time and for any reason without obligation or liability on the part of Fuji, SOA, or Distributor.

12.13 **Failure or Delay In Delivery.** Neither Fuji, SOA, nor Distributor shall be liable, or under any obligation whatever, to Dealer or Dealer's customers for failure to deliver under, or for delay in making delivery pursuant to, any purchase orders of Dealer accepted by Distributor if such failure or delay is due to the fact that delivery or timely delivery was rendered impossible or more burdensome than it would have been in the normal course of business by any cause or event, whether foreseen or unforeseen, including, solely by way of illustration and not by way of limitation, any cause or event in the nature of force majeure, Act of God, Act of Prince, federal law, state law, or local ordinance, foreign or civil war, riot, interruption of navigation, shipwreck, strike, lockout, other labor trouble, embargo, blockade, fire, explosion, delay or failure of Fuji, SOA, or any other supplier of Distributor to make delivery, Fuji's, SOA's or Distributor's insufficient inventory of Subaru Products, or Dealer's failure to comply with established ordering procedures.

12.14 **Return or Diversion.** In the event that Dealer should fail or refuse for any reason whatever to accept delivery of any one or more Subaru Products, Dealer shall pay Distributor the amount of all expenses incurred by Distributor in shipping such Subaru Products to Dealer and in returning the same to the original point of shipment. If Distributor elects to divert the return shipment to another destination, Dealer's responsibility for expenses of return shall be limited to the cost of return to the original point of shipment. This liability shall be in addition to, and not in lieu of, other liabilities which may arise from Dealer's failure or refusal to accept delivery.

## 13 Inventory and Allocation

13.1 **Inventory of Vehicles.** Dealer acknowledges that it is necessary for Dealer to maintain a proper level and mix of Vehicle inventory. Accordingly, Dealer agrees to maintain an inventory of Vehicles. Dealer further agrees to order and purchase, subject to availability, adequate quantities of Vehicles on a regular periodic basis in order for Dealer to achieve satisfactory sales performance. Dealer further acknowledges that an essential element of effective sales promotion is the designation and use of a representative number of demonstrator Vehicles of the most current models and types, which Vehicles must be maintained in first class operating condition and appearance for demonstration purposes.

13.2 **Parts Inventory.** Dealer agrees to carry and stock an inventory of parts, accessories and optional equipment, including Genuine Subaru Parts, adequate to enable Dealer to satisfy reasonably expected customer demand for Genuine Subaru Parts, to fulfill Dealer's service obligations under Section 14 hereof and in accordance with applicable Operating Guidelines. Dealer shall utilize an acceptable automated inventory control system to track parameters including, but not limited to, demand, sales, lost sales, and reorder points for said parts inventory.

13.3 **Allocation.** Dealer acknowledges that Subaru Products may not be available to Dealer in sufficient supply from time to time because of production limitations or other factors. It is understood and agreed that Distributor will use its best efforts to allocate all affected Subaru Products equitably. Dealer acknowledges that the decision of Distributor in such matters is final.

## 14 Service of Subaru Products

14.1 **Scope and Quality.** Dealer acknowledges the importance of proper and professional servicing of Subaru Products and the fair dealing with the consuming public in servicing of Subaru Products. Therefore, Dealer shall provide the best possible customer service to all Vehicle owners who may request such service. Dealer agrees that all service appointments shall be scheduled, and prompt and efficient service shall be provided, for all Vehicles, whether or not under warranty and without regard to where the Vehicle was originally purchased. Furthermore, Dealer agrees to honor all authorized Subaru extended service contracts, including, but not limited to, Added Security®. Dealer shall fully cooperate with Subaru Customer/Dealer Services and shall investigate and handle all complaints received from Vehicle owners with a view to securing and maintaining a high level of customer satisfaction and the goodwill of Vehicle owners toward Fuji, SOA, Distributor, Dealer, and all other Subaru dealers.

14.2 **Pre-Delivery Service.** Dealer agrees that prior to delivery of each new Vehicle to the first retail purchaser, Dealer will complete a pre-delivery service and inspection in accordance with the applicable Subaru Service Manual. Dealer shall be reimbursed by Distributor for specified portions of pre-delivery service and inspection in accordance with Section 20.5 hereof. Prior to delivery of the Vehicle to the customer, Dealer will complete all information, including but not limited to, the customer, dealer, and vehicle identifications and the date of purchase, as required in the Subaru Warranty and Maintenance Booklet. At the time of delivery of a Vehicle to the first retail purchaser, Dealer or Dealer's authorized representative shall sign that Booklet and also obtain the customer's signature therein. Each retail sale and pre-delivery service and inspection must be reported promptly and accurately by Dealer to Distributor on such forms, or be transmitted to Distributor by such means, as SOA shall specify from time to time.

14.3 **Recalls, Owner Notifications, and Similar Programs.** Dealer agrees to participate in recalls, owner notifications, and similar programs involving inspections and corrections of Subaru Products, without regard to where the Subaru Product was originally purchased. Dealer agrees to comply with applicable manuals, bulletins, procedures, and other customer service information issued from time to time to Dealer in that regard. Dealer shall be reimbursed by Distributor for Genuine Subaru Parts and labor, in accordance with Section 20.5 hereof, and for changes in or repairs to Subaru Products mandated by Fuji, SOA, or Distributor pursuant to this Section 14.3.

14.4 **Parts and Service Publications.** Dealer must obtain and have available at all times sufficient copies, in accordance with any applicable Distributor Directive, of Subaru parts and service publications in the specified medium. Dealer agrees to procure and maintain any equipment necessary to utilize all such publications.

**14.5 Service Facility Equipment.** Dealer agrees to procure, maintain, and utilize:

(a) Special service tools specifically designed for service of Subaru Products, as set forth in the Subaru Minimum Special Service Tool Requirements List as amended from time to time; and

(b) General shop equipment and tools as specified by Distributor or SOA from time to time.

**14.6 Safety, Noise, Toxic Waste And Emission Control Requirements.** Dealer agrees to comply with all provisions which are applicable to Dealer of the National Traffic and Motor Vehicle Safety Act of 1966 and the Federal Clean Air Act, as they are amended from time to time, including rules and regulations issued thereunder, and with all other applicable federal, state, and local motor vehicle safety, emission control, and noise requirements. Dealer acknowledges that it is Dealer's responsibility to comply with applicable federal, state, and local laws pertaining to disposal of toxic materials and waste.

## 15 Product Warranty

**15.1 Incorporation of Warranty.** Dealer shall make all sales of Subaru Products which may be covered by a Warranty in such manner that the customer shall acquire all rights in and be subject to all limitations and disclaimers in accordance with the Warranty, to the exclusion of any other warranties, whether express or implied, and whether for merchantability or fitness for any particular purpose, to the extent permitted by applicable law. However, Dealer may issue a separate written warranty, provided that such warranty does not impose any risk, cost, or expense upon Fuji, SOA, or Distributor without their respective prior written consents. Fuji, SOA, and Distributor assume no obligation or liability in connection with Subaru Products, except as expressed in the Warranty or as created by operation of any applicable laws which prohibit a disclaimer of implied warranties or a limitation of consequential damages, and they authorize no other person to assume for them any other obligation or liability in connection with Subaru Products. The text of the Warranty shall be made available by Distributor to Dealer and by Dealer to retail customers, each in accordance with applicable law. Dealer agrees to defend, indemnify, and hold harmless Fuji, SOA, and Distributor from and against any and all claims or demands arising in connection with a sale where Dealer has failed to observe the terms and conditions of this Article 16 or where Dealer has in any manner created or incurred obligations or liabilities greater than or different from those set forth in the Warranty or those created by operation of any applicable laws which prohibit a disclaimer of implied warranties or a limitation of consequential damages.

**15.2 Warranty Procedure.** The procedure for the processing and disposition of Warranty claims and for the return and disposition of Genuine Subaru Parts claimed to be defective shall be governed by the Subaru Customer/Dealer Services Policies, Guidelines, and Procedures Manual, as amended from time to time, and by any applicable Distributor Directive consistent with said manual. Dealer shall be reimbursed by Distributor in accordance with Section 20.5 hereof for Genuine Subaru Parts and Warranty labor necessary to properly perform all Warranty work. Dealer agrees such reimbursement shall constitute full and complete payment to Dealer for such work and further agrees that the customer shall not be obligated to pay any charges for Warranty work, for any reason whatsoever.

15.3 **Damage or Injury Caused or Suffered By Dealer.** FUJI, SOA, AND DISTRIBUTOR UNDERTAKE NO OBLIGATION AND OFFER NO WARRANTY TO DEALER, EITHER EXPRESS OR IMPLIED (INCLUDING, BUT NOT LIMITED TO, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE), AS TO SUBARU PRODUCTS' BEING USED OR OPERATED BY DEALER, ITS EMPLOYEES, OR ITS AGENTS. To the extent not prohibited by applicable law, Fuji, SOA, and Distributor hereby disclaim liability for any and all direct, indirect, special, consequential, or other damage, whether to persons or property, suffered or caused by Dealer, its employees, or its agents. Dealer agrees to defend, indemnify, and hold Fuji, SOA, and Distributor harmless from any such damage claims.

## 16 Accounts, Records, and Reports

16.1 **Uniform Accounting System.** Dealer agrees to maintain the accounting systems and practices set forth in the Subaru Dealer Accounting Manual, as amended from time to time, and to comply with any applicable Distributor Directive consistent with said manual. Dealer agrees that it will furnish to Distributor, by the tenth of each month, a complete and accurate financial and operating statement covering the preceding month and calendar-year-to-date operations, showing the true condition of Dealer's business. Dealer agrees that such information will be furnished to Distributor on such forms, or will be transmitted to Distributor by such means, as Distributor may be authorized to specify from time to time.

16.2 **Reporting Requirements.** Dealer agrees to furnish to Distributor complete and accurate reports regarding Dealer's sales, servicing, and inventories of Subaru Products with such frequency as may be specified by Distributor Directive. If requested by Distributor, such reports shall also include estimates by Dealer of the quantity of Subaru Products actually expected to be ordered from Distributor during a specified period of time in the near future. Dealer agrees to prepare, keep current, and retain records to support requests for Warranty reimbursement. Dealer shall furnish Distributor with such other completed forms and reports as may be required by Distributor Directive. Dealer agrees that all reports furnished to Distributor will be on such forms, or will be transmitted by such means, as Distributor may specify from time to time.

16.3 **Examinations and Audits.** Dealer agrees to permit examination, reproduction, and audit of its books of account and business and corporate records to be made at any reasonable time during regular business hours by persons acting for Distributor or SOA. A copy of any report or audit prepared in connection with such examination shall be furnished to Dealer upon request.

## 17 Prior Termination and Succession

17.1 **Prior Termination by Distributor.** Distributor shall have the right at any time to bring about termination of the Agreement for cause by delivering written notice of termination to Dealer or by sending such notice to Dealer by certified mail, other delivery service, electronic transmission, telegram, or other similar means. Any such termination notice shall take effect immediately or upon the expiration of any waiting period indicated below or as imposed by applicable law, whichever is longer. Any of the following events shall be considered sufficient cause for termination, but they are enumerated by way of illustration and not by way of limitation:

**17.1.1** Death, incompetence, or disabling incapacity of any Controlling Owner, except as set forth in Section 17.3 hereof; or

**17.1.2** Insolvency of Dealer (for example, Dealer is unable to pay its obligations as they mature or Dealer's assets are exceeded by its liabilities); or

**17.1.3** An assignment by Dealer for the benefit of creditors or its entering into a common law composition or any action by Dealer in furtherance of either purpose; or

**17.1.4** Institution by Dealer of any proceeding under the Federal Bankruptcy Code or under any other federal or state insolvency law; or

**17.1.5** Institution against Dealer of any proceeding under the Federal Bankruptcy Code or under any other federal or state insolvency law (Dealer shall have a period of thirty [30] days from the occurrence of this event to remedy such grounds for termination.); or

**17.1.6** Appointment for Dealer or for any portion of Dealer's assets of a receiver, trustee, or other officer having similar powers (Dealer shall have a period of thirty [30] days from the occurrence of this event to remedy such grounds for termination.); or

**17.1.7** Any levy under attachment, execution, or similar process (Dealer shall have a period of thirty [30] days from the occurrence of this event to remedy such grounds for termination.); or

**17.1.8** Failure by Dealer to obtain, or the suspension, revocation, transfer, expiration or termination of, any license, lease or other instrument or agreement necessary for the conduct by Dealer of its business pursuant to the Agreement; or

**17.1.9** Any change in the percentage of Controlling Ownership, or any transfer of any rights or obligations under the Agreement, or a Change of Controlling Ownership Interest, in any case, whether voluntary, involuntary, or by operation of law, without the prior written consent of Distributor; or

**17.1.10** Any change in the Dealer Management which is deemed by Distributor to be detrimental to customer satisfaction or to the business reputation or the public image of Fuji, SOA, or Distributor; or

**17.1.11** Any disagreement or personal difficulties among the Controlling Owners or Dealer Management which, in Distributor's reasonable opinion, may adversely affect the conduct of Dealer's business; or

**17.1.12** Any material misrepresentation by Dealer or any person named in the Agreement as to any fact relied on by Distributor or SOA in entering into, amending, or continuing the Agreement, including, but not limited to, any representation concerning the ownership, management or capitalization of Dealer; or

**17.1.13** Failure of Dealer to maintain the proper dollar amount of the required floor plan line of credit commitment issued by a financial institution approved by, and in a form acceptable to, Distributor for use in connection with Dealer's purchasing of, and carrying inventory in, Vehicles; or

**17.1.14** Impairment of the business reputation or financial standing of, or conviction of any crime or other violation of law in any court of competent jurisdiction of, Dealer, any member of its management, or any owner, officer, or director of Dealer, if in Distributor's reasonable opinion such impairment or conviction might adversely affect the conduct of Dealer's business or would tend to be harmful to the public image of Fuji, SOA, or Distributor or to the marketing of Subaru Products; or

**17.1.15** Transmission or submission by Dealer of a report or form (including, but not limited to, a notification of Vehicle sale), financial statement, warranty claim, or other claim for reimbursement, refund, or credit, which Dealer knew or should have known was misleading, false, fraudulent, or materially inaccurate. Distributor reserves the right in any event to collect or debit Dealer's account for the amount of such claims; or

**17.1.16** Dealer's abusing, misusing, discrediting, or otherwise impairing the name or reputation of Fuji, SOA, Distributor, any other Subaru distributor or dealer, or any Marks, or any Subaru Products; or

**17.1.17** Failure of Dealer to operate the Facilities for all Dealer operations during such hours as automobile dealer sales and service facilities are customarily operated in the Area of Responsibility, except for reasons beyond Dealer's control; or

**17.1.18** Any undertaking by Dealer to conduct, directly or indirectly, any of Dealer's operations at a location other than the Facilities, unless given prior written authorization by Distributor; or

**17.1.19** Failure by Dealer to pay, within ten (10) days after written demand from Distributor, any delinquent accounts or other monies due to Distributor from Dealer; or

**17.1.20** Dealer's entering into any agreement, combination, understanding, or contract, whether oral, written, or otherwise, with any other person, firm, or other entity for the purposes of fixing prices of Subaru Products or otherwise violating any law; or

**17.1.21** Failure of Dealer to make improvements, alterations, or modifications to the Facilities in accordance with Section 6.1 hereof; or

**17.1.22** Failure by Dealer to comply with the provisions of Article 4 hereof pertaining to Customer Satisfaction; or

**17.1.23** Failure or refusal of Dealer to execute a new and superseding agreement or amendment to the Agreement and to return the same to Distributor within thirty (30) days after it is offered to Dealer, in the event that Distributor should at any time determine that federal or state laws, or regulations adopted thereunder or any new interpretation thereof, change the effect or impair the validity of, or require changes in, any of the provisions of the Agreement and/or the Standard Provisions and offers Dealer a new and superseding agreement that has been appropriately modified to reflect changes that are made as a result of such new laws, regulations, or interpretations or offers Dealer an amendment to the Agreement reflecting such changes; or

**17.1.24** Failure by Dealer to substantially fulfill, based upon evaluations by Distributor, its responsibilities, including, but not limited to, the following:

(a) Sale of Subaru Products; or

(b) Maintenance of the Facilities and the approved location; or

(c) Service of Subaru Products; or

(d) Submission of accurate reports and other information as required under the Agreement or as may be reasonably requested by Distributor; or

(e) Permitting Distributor or SOA to make an examination or audit of Dealer's accounts and records concerning Dealer's business, after receipt of notice from Distributor or SOA requesting such examination or audit; or

(f) Payment for Subaru Products or any other products or services purchased by Dealer from Distributor; or

(g) Maintenance of net worth, net cash and net working capital in accordance with guidelines; or

(h) Fulfillment by Dealer of Dealer's warranties or obligations; or

(i) Dealer's performance under the Agreement, whether or not expressly identified herein as material in nature.

In such event of 17.1.24(a) through 17.1.24(i), Distributor will notify Dealer of any such failure and will review with Dealer the nature and extent of such failure and the reasons which, in Distributor's opinion, account for such failure. Thereafter, Distributor will provide Dealer with a reasonable opportunity to correct the failure. If Dealer fails to make substantial progress toward remedying such failure before the expiration of such period, Distributor may terminate the Agreement.

**17.2 No Waiver of Prior Breach.** In the event Distributor shall be entitled to terminate the Agreement pursuant to the provisions of this Article 17, but shall fail to do so, such failure shall not be considered a waiver of the right of Distributor to so terminate the Agreement unless and until Distributor shall have entered into a subsequent written agreement with Dealer superseding the Agreement. However, any event entitling Distributor to terminate a prior dealer agreement with Dealer may be considered at any subsequent time together with any intervening events in determining Distributor's right to terminate the then existing agreement.

**17.3 Successor to Controlling Owner in Certain Events.** Notwithstanding the right of Distributor to bring about the prior termination of the Agreement pursuant to Subsection 17.1.1 hereof upon the death, incompetence, or disabling incapacity of any Controlling Owner, Distributor shall not so terminate the Agreement if:

**17.3.1** Upon such event, the subject Controlling Owner's controlling interest in Dealer passes directly to a spouse and child(ren), or any of them; or

**17.3.2** Prior to such event, Distributor has approved an individual or individuals under a duly executed and unrevoked Successor Addendum, and the subject Controlling Owner's controlling interest is assumed by that individual.

Distributor reserves the right to revoke its approval of the individual named in such Successor Addendum at any time prior to the event giving rise to succession if an adverse change should occur in that individual's business reputation or financial, physical, mental, or other ability to own or manage Dealer.

If any Controlling Ownership interest is transferred under Section 17.3.1 or 17.3.2 herein:

(a) The Dealer Management must remain unchanged; or

(b) Within ninety (90) days after the death, incompetence, or disabling incapacity prompting the transfer, Dealer Management, acknowledged in writing by Distributor to be satisfactory, must be in place.

**17.4 Extension.** The Agreement may only be extended by means of a written document duly executed on behalf of Distributor by one of the persons referred to in Section 20.1 hereof. Any business relations of any nature whatever between Distributor and Dealer after the expiration or prior termination of the Agreement, absent the existence of a written extension, shall not operate as an extension of the Agreement. Nevertheless, all such business

relations, so long as they are continued, shall continue to subject Dealer to its obligations under the Agreement.

**17.5** **Right of First Refusal.** If a proposal is submitted by Dealer under Paragraph 8 of the Agreement, Distributor shall have the right to purchase such Subaru assets or ownership interest as follows:

**17.5.1** Distributor may elect to exercise its purchase right by written notice to Dealer within fifteen (15) business days after Dealer has furnished to Distributor all applications and information reasonably requested by Distributor to evaluate Dealer's proposal.

**17.5.2** Distributor's right under this Section 17.5 shall be a right of first refusal, permitting Distributor to:

(a) Assume the proposed transferee's rights and obligations under transferee's contract with Dealer; and

(b) Cancel the Agreement and all rights granted Dealer hereunder.

Except to the extent specifically inconsistent with the terms of the Agreement, the price and all other terms of Distributor's purchase shall be as set forth in any bona fide written purchase and sale contract between Dealer and its proposed transferee and in any related documents.

**17.5.3** Distributor shall not exercise its right of first refusal if Dealer's proposed sale or transfer is to:

(a) the spouse of the Majority Controlling Owner; or

(b) a child or grandchild of the Majority Controlling Owner; or

(c) a spouse of a child or grandchild of the Majority Controlling Owner; or

(d) a brother, sister, or parent of the Majority Controlling Owner; or

(e) any of Dealer's other Controlling Owners; or

(f) any member of Dealer Management.

**17.5.4** If Dealer's proposed sale or transfer is to a successor approved in advance by Distributor or to Dealer's employees as a group, then Dealer may withdraw its proposal within fifteen (15) business days following receipt of Distributor's notice of election of its purchase right.

**17.5.5** Dealer shall furnish to Distributor an itemized fair-market valuation for all of the Subaru assets, tangible and intangible, to be purchased, copies of all applicable liens, mortgages, encumbrances, leases, easements, licenses, and other documents affecting any of the property to be transferred and shall assign to Distributor any permit or license necessary for the continued conduct of Dealer's operation.

**17.5.6** Distributor may assign each right of first refusal to any party it chooses; however, Distributor will remain primarily liable for payment of the purchase price to Dealer.

**17.5.7** If Distributor exercises its purchase right, Distributor will reimburse Dealer's proposed transferee for reasonable documented actual expenses which such proposed transferee incurred through the date of such exercise and which are directly and solely attributable to the transaction Dealer proposed.

**17.5.8** Nothing contained in this Section 17.5 shall require Distributor to exercise its right of first refusal, in any case, or shall restrict any right Distributor may have to refuse to approve Dealer's proposed transfer.

## 18 Rights and Obligations Upon Expiration or Prior Termination.

**18.1** **Subaru Signs, Marks and Printed Matter.** Upon the expiration or prior termination of the Agreement, Dealer shall immediately:

**18.1.1** Subject to the terms and conditions of the Subaru of America Dealership Sign Lease Agreement, if applicable, remove from public display, at its own expense, all signs and other displays containing the word "Subaru" or any other Marks and cause to be made such changes in signs and in any distinctive design features of Dealer's Facilities as Distributor shall direct, so as to distinguish the signs and the Facilities from the appearance of authorized signs and facilities; and

**18.1.2** Refrain from use of any Marks, cease to hold itself out as an authorized Subaru dealer, destroy all stationery, showroom design elements unique to Subaru, and other printed material bearing any Marks, and, if Dealer's corporate, trade, or business name or names contain any Marks, promptly take all steps to remove the same therefrom. In the event that Dealer fails to comply with the terms and conditions of this Subsection 18.1.2, Distributor shall have the right to enter upon Dealer's premises and remove all display of any Marks without liability to Dealer, and Dealer agrees that it shall reimburse Distributor or SOA, as the case may be, for all costs and expenses incurred in connection therewith, including reasonable attorneys' fees; and

**18.1.3** Deliver to Distributor at Distributor's place of business or to Distributor's designee(s), free of all charge except as otherwise provided in this Subsection 18.1.3, any and all technical, service, warranty, advertising, and other printed literature and material related to Subaru Products. To the extent that any such material was obtained by Dealer from Distributor and was originally delivered against payment, a reasonable price determined by Distributor shall be refunded upon its return; and

**18.1.4** Cause any and all telephone listings or advertisements which identify Dealer as a dealer in Subaru Products to be discontinued from all future directories.

**18.2** **Customer Orders and Files.** Upon the expiration or prior termination of the Agreement, Dealer shall immediately transfer to Distributor or to Distributor's designee(s) all customer orders for Subaru Products then pending, all deposits made thereon, whether in cash or in kind, and shall also transfer, if requested, all Dealer's files (or complete copies thereof) relating to Warranty matters, to promotional programs, to customer service, and to prospective customers for Subaru Products. Distributor shall have the right to cancel all of Dealer's pending orders for Subaru Products.

**18.3** **No Liability for Payment.** With the exception of Distributor's obligation, pursuant to Subsection 18.1.3 hereof, to pay for certain printed literature and material related to Subaru Products originally delivered against payment, none of the requirements of Sections 18.1 or 18.2 hereof shall result in any liability of Distributor, SOA, or Fuji to Dealer for damages, commissions, loss of profits or compensation for services, or in any other liability of any kind or nature whatever.

**18.4** **Optional Repurchase.** Upon the expiration or prior termination of the Agreement, Distributor shall have the option to purchase from Dealer all or any part of the Subaru Products (whether or not originally purchased from Distributor) and special service tools

described in Section 18.6 hereof. If Dealer receives written notice within ninety (90) calendar days after such expiration or prior termination of Distributor's election to exercise the foregoing option, Dealer shall be obligated to sell to Distributor the items specified in the notice at prices calculated pursuant to Section 18.6 hereof.

18.5 **Mandatory Repurchase.** If prior termination of the Agreement occurs under Section 17.1 hereof and Distributor does not exercise the option granted to Distributor in Section 18.4 hereof as to all of the Subaru Products and special service tools described in Section 18.6 hereof, Dealer shall have the option to require Distributor to purchase the same at prices calculated pursuant to Section 18.6 hereof. Dealer's election to exercise the foregoing option shall be effective if written notice of such election is received by Distributor within thirty (30) calendar days after receipt by Dealer of Distributor's notice pursuant to Section 18.4 hereof or, if no such notice was sent by Distributor to Dealer, then within one hundred twenty (120) calendar days after such prior termination of the Agreement occurs.

18.6 **Subaru Products and Special Service Tools Subject To Repurchase.** To the extent required by any notice from Distributor to Dealer pursuant to Section 18.4 hereof and by any notice from Dealer to Distributor pursuant to Section 18.5 hereof, the following items shall be sold by Dealer and purchased by Distributor within ninety (90) calendar days after the last date, as determined under Section 18.5 hereof, for receipt by Distributor of Dealer's notice:

**18.6.1** All new, unused, undamaged, and unaltered Vehicles then unsold in Dealer's inventory which are of the then-current models and types, which were purchased by Dealer from Distributor, and which are, in Distributor's sole opinion, able to be resold as new. The price for such Vehicles shall be the same as the price at which the Vehicles were originally purchased by Dealer from Distributor or the price then last established by Distributor for Vehicles, whichever shall be lower, and in either case less:

(a) All incentives, rebates and other allowances made with respect thereto; and

(b) Freight and handling charges for transporting the Vehicles to Dealer; and

(c) Holdback previously paid to Dealer; and

(d) Advertising charges and related costs, if any; and

**18.6.2** All new, unused, undamaged and unaltered Genuine Subaru Parts in original packaging then unsold in Dealer's inventory, which were purchased by Dealer from Distributor, are in first class salable condition and are listed as orderable in the current Dealer Parts Price Book issued by SOA but which are not non-orderable as defined by SOA, except that Distributor shall not be under any obligation to repurchase from Dealer:

(a) Any Genuine Subaru Parts which are listed in the then current Dealer Parts Price Book as not-orderable, superseded, or non-returnable; and

(b) Any accessories other than those applicable to the then current model year Vehicles.

The price for such Genuine Subaru Parts shall be the price last established by SOA or by the supplier thereof for the sale of identical parts, less any allowances and less fifteen percent (15%) for handling; and

**18.6.3** All special service tools designed to service Subaru Products, and which are owned by Dealer, are unencumbered, and are in the possession of Dealer on the effective date of termination, provided that said tools are in good condition and were originally purchased by Dealer from Distributor within the thirty-six (36) month period preceding

the date of termination. The price for such tools shall be reasonably determined by Distributor, provided, however, that such price shall in no event be less than the amount determined by reducing Dealer's cost for such tools and equipment by straight line depreciation on the basis of a useful life of thirty-six (36) months, less fifteen percent (15%) for handling.

**18.7 Inspection, Packing, Title, Satisfaction of Encumbrances, and Payment.** Within thirty (30) calendar days after expiration or termination of the Agreement, Dealer shall deliver to Distributor an accurate inventory, in the form required by Distributor, of all property to be repurchased by Distributor under Sections 18.4 or 18.5 hereof. At any time after the expiration or prior termination of the Agreement, Distributor or its designee(s) shall have the right to enter the Facilities or other locations for the purpose of verifying the inventory or inspecting Dealer's stock of Subaru Products and special service tools. As soon as possible after Distributor receives and reviews the inventory of property to be repurchased, Distributor shall furnish Dealer with shipping instructions, and Dealer agrees to make delivery of the property to be repurchased, transportation charges prepaid, to destinations within the United States designated by Distributor. Dealer shall comply in all respects with the provisions of all applicable bulk sales laws or similar statutes protecting the transferee of personal property with respect to liabilities of the transferor. Dealer agrees to execute and deliver to Distributor instruments satisfactory to Distributor conveying title to the aforesaid property to Distributor or Distributor's designee(s). If such property is subject to any lien, charge, encumbrance or claim of any kind, Dealer agrees to secure the discharge and satisfaction thereof prior to sale. Promptly following performance by Dealer of all of its obligations under this Article 18, Distributor shall pay Dealer the price of the items purchased, as adjusted for the reconciliation of any outstanding account balances between Distributor and Dealer.

## 19 Indemnification

**19.1 Indemnification by Dealer.** Dealer agrees to defend, indemnify and hold harmless Fuji, SOA, and Distributor from and against all loss, liability, cost, expense, and damage (including punitive or exemplary damages) arising from any claim or legal action related to:

(a) Dealer's failure or alleged failure to comply in whole or in part with any obligation assumed by Dealer pursuant to the Agreement or pursuant to any of the documents incorporated by reference into the Agreement, including, but not limited to, Dealer's failure to follow all procedures for handling potential lemon law claims; or

(b) Dealer's negligent or improper, or alleged negligent or improper, repair or service of any new or used Vehicle or such repair, service, or installation of any other Subaru Products; or

(c) Dealer's breach or alleged breach of any contract between Dealer and any of Dealer's customers; or

(d) Dealer's misleading statement or misrepresentation or alleged misleading statement or misrepresentation made to the general public or to a customer of Dealer; or

(e) Dealer's warranting any Subaru Product other than within the terms of the applicable Warranty; or

(f) Dealer's unauthorized alteration or modification of any Subaru Product; or

(g) Dealer's sale or use of any part, accessory, or optional equipment which is not a Genuine Subaru Part; or

(h) Dealer's negligence, error, or omission.

If Dealer fails or refuses to undertake the aforesaid defense, then Fuji, SOA, and Distributor may individually or jointly conduct their own respective defenses, and Dealer shall be liable for the costs of each such defense, including reasonable attorney's fees and court costs, together with any judgment or settlement paid by Fuji, SOA, or Distributor.

**19.2 Indemnification of Dealer.** Dealer shall give prompt written notice to SOA and Distributor of all claims that may be asserted and legal actions that may be commenced against Dealer with respect to bodily injury, property damage, or breach of warranty alleged to be caused by a manufacturing defect or deficiency in design in a Subaru Product. If such claim or action is based solely upon allegations of a manufacturing defect (of a type which could not have reasonably been discovered by Dealer during pre-delivery inspection or subsequent servicing) or design deficiency, SOA and/or Distributor, as the case may be, shall (within a reasonable period of time after receipt from Dealer of a written request for indemnification, accompanied by copies of all pleadings and all information then available regarding the circumstances giving rise to the claim or action) defend, indemnify and hold Dealer harmless from any and all settlements made by SOA and Distributor and final judgments rendered (except punitive damages assessed against Dealer) with respect to any such claim or action, provided that:

(a) The Subaru Product was sold in the ordinary course of Dealer's business; and

(b) No default judgment has been entered against Dealer; and

(c) Dealer cooperates fully in the defense of such claim or action in such manner and to such extent as SOA and Distributor may require.

If any evidence discloses the possibility of, or if there is any allegation of, any occurrence of the kind described in items (a) through (h) of Section 19.1 hereof, Dealer shall immediately obtain its own counsel and defend the entire claim or action for itself. After receipt of Dealer's written request and from time to time thereafter, as necessary, SOA and/or Distributor, as the case may be, shall advise Dealer in writing as to whether and to what extent the circumstances involved in the claim or action merit the hold harmless, defense and indemnification protections specified in this Section 19.2.

**19.3 Dealer Insurance.** Inasmuch as Dealer may from time to time encounter claims by customers and others which could result in liability to Dealer, it is recommended that Dealer obtain for its own benefit appropriate types of insurance coverage, with policy limits sufficient to afford Dealer the greatest possible protection.

## 20 General Provisions

**20.1 Authority to Sign for Distributor.** Dealer acknowledges that only the president or a vice president of Distributor is authorized on behalf of Distributor to execute the Agreement or to agree to any variation, modification, or amendment of any provision thereof or hereof, or to issue any notice of prior termination with respect thereto.

**20.2 Variations, Modifications, and Amendments.** Neither this document nor the Agreement may be varied, modified, or amended except by an instrument in writing duly signed by the party or parties to be bound thereby.

**20.3 Additional Dealers.** Dealer acknowledges that Distributor has the right, subject to compliance with any applicable law, to appoint additional Subaru dealers in or near the Area of Responsibility.

**20.4 Representation Plan.** Distributor reserves the right to determine, from time to time, in its best judgment, the numbers, locations, and sizes of authorized dealers necessary for proper and satisfactory sales and service representation for Subaru Products. In making such determinations, Distributor will from time to time conduct, to the extent deemed adequate by Distributor and subject to available information, studies of the Area of Responsibility and its surroundings, including, but not limited to, such factors as geographic characteristics, consumer shopping habits, competitive automobile make representation patterns, sales and service requirements, convenience of customers or potential customers and past and future growth and other trends in marketing conditions, population, income, Subaru units in operation, Subaru sales and registrations and competitive make registrations. After making such a determination, Distributor will notify Dealer of any proposed change in Distributor's market representation plan for the Area of Responsibility. If Distributor's market representation plan does not provide for the long term continuation of representation of Subaru Products at the current location of Dealer's Facilities and Dealer is so notified, Dealer may continue its operations at that location under and subject to the Agreement and any renewals thereof which may be entered into. However, Distributor shall not be under any obligation to consent to any Change of Controlling Ownership Interest at that location.

**20.5 Dealer Reimbursement.** To the extent that Distributor requires Dealer to furnish labor or to use Genuine Subaru Parts to fulfill Dealer's obligations under Sections 11.2, 12.9, 14.2, 14.3, or 15.1 hereof, Distributor shall reimburse or credit Dealer for such Genuine Subaru Parts and/or labor, as the case may be, at such rate or rates as Distributor is authorized to establish from time to time. Distributor shall advise Dealer of the applicable rates, which will be established in each instance with due regard for any applicable law. No claim for reimbursement will be accepted if the claim is submitted by Dealer later than the applicable time period established in the Subaru Customer/Dealer Services Policies, Guidelines, and Procedures Manual as amended from time to time.

**20.6 Notice of Lack of Good Faith or Violation of Law.** To assist in maintaining open and harmonious relationships between the parties, Dealer shall advise an officer of Distributor promptly and in detail, by written notice, of any act or failure to act on the part of Distributor personnel which Dealer believes was not in good faith or was coercive, threatening or intimidating toward Dealer or in violation of any applicable law, so that Distributor may investigate and, if necessary and possible, rectify any such act or failure.

**20.7 Waiver of Jury Trial.** Distributor and Dealer, and their respective owners, officers, directors, agents and employees, hereby waive, to the extent permitted by law, the right to trial by jury for all disputes, controversies or claims which may arise between Dealer and Distributor out of, in connection with, or relating to the negotiation, interpretation, performance, termination or consequences of the Agreement.

**20.8 Entire Agreement.** The Agreement, these Standard Provisions and the documents referred to or incorporated by reference therein or herein contain the entire understanding between the parties. No representations or statements other than those expressly set forth therein or herein were made or relied upon in entering into the Agreement.

**20.9 Assignment by Distributor.** Distributor may assign its rights and obligations under the Agreement to another entity which desires to accept such assignment. Dealer shall receive notice of any such assignment.

**20.10 Documents Incorporated by Reference.** The Agreement and these Standard Provisions are deemed to incorporate and render enforceable the most current version of the following documents and all future amendments thereto:

- Subaru Dealer National Minimum Standards and Operating Guidelines Table
- Minimum Special Service Tool Requirements List
- All documents referred to in the Subaru Dealer Service Publication and Documents list, including but not limited to the Subaru Customer/Dealer Services Policy, Guidelines, and Procedures Manual
- Subaru Dealer Appointment Procedures Manual
- Subaru Dealer Accounting Manual
- Subaru Market Development Procedures Manual
- Subaru Owner Loyalty Program Reference Guide
- Subaru Signature Facility Deliverable Binder
- Distributor Minimum Standards (if any).

**20.11 Release of Claims.** The Agreement supersedes, as of the beginning of its term, all prior Subaru dealer agreements, if any, entered into by Dealer. To the extent not prohibited by applicable law, the parties hereto hereby release any and all claims of any kind and nature whatsoever arising from or out of or in connection with any such prior agreement(s), provided, however, that this shall not be deemed a release of any unsatisfied account balances between the parties thereto, any claims for indemnification of the nature described in Sections 12.5, 15.1, 15.3, 19.1, or 19.2 hereof, or any claims asserted in legal actions or proceedings then pending and involving the parties hereto. If the foregoing release of claims provision is deemed or rendered ineffective under applicable law as to either Dealer or Distributor, then such provision shall be deemed ineffective as to both Distributor and Dealer.

**20.12 Parties In Interest.** Nothing in the Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of the Agreement on any person other than the parties hereto; nor is anything in the Agreement intended to relieve or discharge the obligations or liability of any third persons to any party to the Agreement; nor shall any provision hereof give any third persons any right of subrogation or action over against any party to the Agreement.

**20.13 Notices.** All notices, demands, or formal communications under or pursuant to the provisions of the Agreement shall be in writing and shall be directed to the respective addresses of the parties stated in Paragraph 1 thereof, or if either of the parties shall have specified another address by notice in writing to the other party, then to the address last specified, and shall be deemed (unless otherwise specified herein) to have been given when deposited, properly addressed, in the United States mail or with another delivery service, postage or charges prepaid, or when sent by electronic transmission, telegram or other similar communications method. Each party shall immediately advise the other in writing of any change of address.

**20.14 Divisibility.** If any provision hereof or of the Agreement shall be held invalid or to be unenforceable for any reason whatever or to violate any law of the United States, any State, the District of Columbia, the Commonwealth of Puerto Rico or the U.S. Virgin Islands, the Agreement shall be considered divisible as to such provision in the relevant jurisdiction and the remainder of the Agreement shall be valid and binding as if such provision was not included or incorporated by reference herein or therein.

**20.15 Titles.** The subject titles appearing herein and in the Agreement have been inserted for convenient reference only and shall not in any manner affect the construction, interpretation or meaning of the text.

**20.16 Gender.** Words used in the Agreement and in these Standard Provisions, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context requires.